**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
MICHAEL BURKHARDT,

                            Petitioner,

              -against-

MARK BRADT, Superintendent of Attica Correctional
Facility,

                          Respondent.
-------------------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
12-CV-1919 (ADS)

<u>**APPEARANCES:**</u>

**Langone & Associates, PLLC**
*Attorneys for the Petitioner*
600 Old Country Road
Suite 328
Garden City, New York 11530
      By: Richard M. Langone, Esq., Of Counsel

**Suffolk County District Attorney's Office**
*Attorneys for the Respondent*
Criminal Courts Building
200 Center Drive
Riverhead, New York 11901
      By: Michael Herman Blakey, Assistant District Attorney

**SPATT, District Judge.**

      Michael Burkhardt (the "Petitioner") petitions this Court for a writ of habeas corpus

under the provisions of 28 U.S.C. § 2254. A jury determined that he abducted a ten-year-old girl

and convicted him of kidnapping in the second degree and endangering the welfare of a child.

He is presently incarcerated and serving a determinate term of seventeen years.

      The Petitioner challenges his kidnapping conviction on three grounds: (1) the sufficiency

of the evidence, (2) the ineffective assistance of trial counsel, and (3) the trial court's failure to

submit a renunciation charge to the jury. For the following reasons, the petition is denied in its entirety.

# I. BACKGROUND

The Court will recite the relevant facts in the light most favorable to the verdict. <u>Garbutt v. Conway</u>, 668 F.3d 79, 80 (2d Cir. 2012) (per curiam). When citing to any documents, the Court will use the page numbers assigned by the CM/ECF system, not the internal page numbers.

## A. Factual Background

On October 5, 2006 at about 3:45 p.m., a ten-year-old girl rode her bicycle to a neighbor's house. (Trial Tr. 226–28.) The trip was short, but her mother accompanied her for most of the way. As they crossed the street, the child noticed a yellow decal-covered car with tinted windows following their path. After the mother turned back to walk home, the child rode over a hill and noticed the same car parked on the left side of the street. (Trial Tr. 307–08, 642–43.) As she passed by on the right side, the driver of the vehicle—the Petitioner—ran out and grabbed her, tearing her underwear on the bicycle seat. (Trial Tr. 310–12, 315.) He put the child headfirst into the backseat of his car and drove off. (Trial Tr. 316.) The child tried to open the door, but child safety locks prevented her from escaping. (Trial Tr. 318–19, 569.) Throughout the ordeal, she kicked, screamed, and cried. (Trial Tr. 315, 318.)

A few blocks later, the Petitioner parked next to a wooded area. He climbed into the backseat, flipped the child on her stomach, and used furry handcuffs to restrain her. (Trial Tr. 317–18, 321.) The Petitioner also covered her eyes and mouth with duct tape. (Trial Tr. 324–26.) The child's mouth was red and raw, and she had already suffered a laceration on her leg when the Petitioner initially grabbed her. (Trial Tr. 276–77, 441.)

The two sat in the car for several minutes, as the child cried and begged to go home. (Trial Tr. 327.)  Then the Petitioner abruptly said that he was letting her go.  (Trial Tr. 352.) After removing the handcuffs and the duct tape, he got out of the car and opened the rear driver's side door.  (Trial Tr. 327–29, 343.)  The Petitioner warned the child that if she ever told anyone, he would find her.  (Trial Tr. 329.)  The child fled to a neighbor's house.  (Trial Tr. 145.)  Four days later, the police arrested the Petitioner and charged him with second-degree kidnapping and endangering the welfare of a child.  (Trial Tr. 462–63.)  The Petitioner later confessed to the police, but this confession was not introduced at the trial.  (Confession, Dkt. No. 14-1, at 9–12.)

The Government's case included testimony from various neighbors, one of which described the area as a "quiet residential" place.  (Trial Tr. 130.)  Another neighbor spotted the Petitioner's car near the wooded area but did not look inside the tinted windows.  (Trial Tr. 198–99.)

The Defense presented testimony from a licensed private investigator and the Petitioner's father.  The investigator testified that the Petitioner drove approximately one-tenth of a mile for less than one minute.  (Trial Tr. 636–37.)  The Petitioner's father provided insight on his son's background.  (Trial Tr. 640–43.)

The Defense rested its case without the Petitioner's testimony.  (See Trial Tr. 726.) However, early indications suggested that the Petitioner would testify.  After jury selection, the Government surprised defense counsel, Eric Naiburg ("Naiburg" or "trial counsel"), by stating that it would not introduce the Petitioner's confession to the police, and in light of evidentiary rules, the court precluded Naiburg from entering the confession himself.  (Trial Tr. 17–18, 41–45.)  After this decision, Naiburg indicated to the court that the Petitioner would likely testify:

> I anticipated the Court's ruling . . . and it is now [] under very strong consideration and probably likely that I'm going to call the Defendant as a witness in this trial.
>
> \* \* \*
>
> I'm going to tell the jury that it appears to me now that the Defendant will testify in his own behalf and depending on . . . how the evidences comes in . . . .

(Trial Tr. 45, 48.)  During his opening statement, Naiburg stated the following:

> [The decision to testify is] a choice that will be made by the defendant, by his counsel, at some time during the evidence taking or at the end of the people's case.
>
> \* \* \*
>
> Michael will testify that a day or so before October 5, 2006 his wife was suicidal, and she had gone [] on an emergency basis to a psychiatric ward of a hospital and he was quite distraught.  He will admit to you that he took the child.  We will talk more about that. He will testify that within moments of that apprehension, he knew full well that he was going to release her in a short, brief period of time, and he will testify and you will hear from other evidence in this case that everything that man did, as wrong as it was at that point, that everything the man did from the time that child got into that car was an attempt, one, to calm her down, two, to release her, and three, to prevent his own apprehension and discovery.

(Trial Tr. 101–02.)  In his summation, Naiburg referred to the absence of the Petitioner's testimony.  (Trial Tr. 726 ("I indicated to you in my opening statement that Michael might testify, and obviously, he did not.  His Honor will instruct you he had no obligation to take the stand in his own defense . . . .").)

At the close of the trial, Naiburg requested unlawful imprisonment in the second degree as an alternate charge.  The court granted that request.  The Government then made an application for the lesser-include charge of attempted kidnapping in the second-degree, which the court granted.  (Trial Tr. 657–83.)

Naiburg also requested that the jury receive a renunciation instruction for second-degree kidnapping—that is, the Petitioner chose to withdraw from the crime before its completion. (Trial Tr. 684–85.)  The court denied the request, concluding that "Unlawful Imprisonment in the Second Degree would have been [] completed as of the time the infant was placed in the back of the car and the car was positioned in a secluded area.  Any action by the defendant thereafter would not constitute a renunciation of any of th[e] crimes."  (Trial Tr. 690–91.)  Further, the Government argued, and the court agreed, that the victim's actions was the "impetus" for the Petitioner's decision to let her go.  (Trial Tr. 684–91.)

After a two-hour deliberation, the jury convicted the Petitioner of second-degree kidnapping and endangering the welfare of a child.  (Trial Tr. 824–27.)

## B. The Sentencing

During the sentencing phase, the Government requested a determinate term of twenty years; post-release supervision for five years; a permanent order of protection for the victim; and certification of the Petitioner as a sex offender.  (Sentencing Tr. 7–8.)  Although the trial contained no "allegations of a sexual nature," the Government argued that "the legislature in enacting the Sex Offender Registration Act[] clearly recognized the motivations behind this type of crime."  (Sentencing Tr. 7.)  Naiburg acknowledged that no one "will ever know the real motivations for what occurred on that day."  (Sentencing Tr. 22.)  He also argued for a lesser sentence, comparing the Petitioner's otherwise clean record with the "horrendous" nature of the crime.  (Sentencing Tr. 16, 21–22.)

The judge imposed a determinate term of seventeen years for kidnapping and one year for the endangerment charge; both sentences to run concurrently.  (Sentencing Tr. 27–28.)  The former crime carried a maximum sentence of twenty-five years.  (Sentencing Tr. 5.)  The judge

also granted the Government's request for five years' post-release supervision; a permanent order of protection; and sex offender certification. (Sentencing Tr. 27–29.)

## C. Post-Conviction Proceedings

### 1. The Motion to Vacate

The Petitioner filed a motion to vacate the convictions with the County Court, claiming ineffective assistance of counsel on two grounds. (Mot. to Vacate, Dkt. No. 14-23, ¶¶ 3–7 at 3–5.)

First, the Petitioner asserted that Naiburg ignored his repeated requests to testify and threatened to withdraw if the Petitioner did not relent. (M. Burkhardt Aff., Pet. Ex. A, ¶¶ 6, 8, 10.) His parents, as liaisons between the Petitioner and Naiburg, also submitted affidavits, which echoed their son's allegations. (Breinlinger Aff., Pet. Ex. B, ¶¶ 9; G. Burkhardt Aff. ¶¶ 5, 7, 11, 15, 19; see also Breinlinger Ltr. to Naiburg, Pet. Ex. B, at 30 (discussing Miranda rights) & 32 (discussing trial details, such as Wade, Mapp, and Huntley hearings).) The Petitioner's father also discussed Naiburg's purported position to prohibit his clients from testifying. (G. Burkhardt Aff. ¶ 5 ("Mr. Naiburg also made it clear early on that he never allows his clients to testify . . . .").)

Second, the Petitioner contends that Naiburg failed to conduct a psychiatric evaluation that might have led to a diminished capacity defense. (But see Pet. at 95 (conceding that the Petitioner "had no prior criminal history or history of mental illness").) After the trial concluded, the Petitioner hired Dr. Alexander Sasha Bardey to conduct a forensic-psychiatric evaluation. (Bardey Report, Pet. Ex. D.) According to Dr. Bardey's report, the Petitioner suffered from a psychiatric condition—"acute stress disorder"—that negated his intent to kidnap:

> For all the reasons set forth in this report, it is my opinion with a reasonable degree of medical certainty that Mr. Burkhardt was

> suffering from Acute Stress Disorder at the time of the commission
> of the crime that rendered him unable to purposefully "abduct" the
> complainant, a necessary element of the crime of Kidnapping in the
> Second Degree.

> \* \* \*

> Mr. Burkhardt, as result of the confluence of extremely traumatic
> events in his life, culminating in the hospitalization of his wife
> shortly before the commission of the crime, developed
> overwhelming feelings of anxiety and entered a disassociated
> mental state. Though brief in nature, the period of time during
> which Mr. Burkhardt experienced these symptoms, so altered his
> thinking, feeling, and behavior that he was no longer functioning
> with a rational mind. His awareness, recollection, ability to reflect
> were all significantly impaired, as were his ability to control and
> plan his actions.

(Bardey Report at 41, 66.) The Petitioner later explained that he had "an out-of-body experience" thinking that the victim was not a human being but "a distorted memory of [his] childhood." (M. Burkhardt Aff. ¶ 12 ("By grabbing her, I irrationally believed for a moment that I was holding on to my own past, a time when my life was much better.").) However, even after this supposed revelation, the Petitioner attempted to cover the victim's mouth with duct tape. Also, about three hours after the incident, the Petitioner went to work. (Confession at 11–12.)

In a sworn affidavit, Naiburg rejected both of these arguments. The details of his denials are relevant for reasons to be explained:

> The moving papers allege that the defendant was prevented from
> testifying at trial because of a threat made by me that I would
> withdraw from the case should the defendant exercise his right to
> testify. This allegation is totally without merit and flies in the face
> of the realities of the situation. The defendant, Michael Burkhardt,
> from the inception of the case made strong representations that he
> did not wish to testify at trial. In fact, I was often called upon to
> assure the defendant that he would not be forced to testify and that
> decision was his and his alone to make.

> Your affirmant has been practicing criminal law for over 37 years
> and is fully aware that it is not counsels [sic] choice as to whether a

defendant testifies or not. That choice remains with, and is never taken from, the defendant. In the instant case your affirmant agreed with the defendants [sic] evaluation that he would make a very poor witness and would do unnecessary harm to his case if he were to testify. However, never was the defendant told it would be my decision or that I would withdraw from the case if he intended to testify.

During the course of my legal career I have tried numerous cases where psychiatric defenses were employed. It is my practice, and has been my practice, to keep an open mind as to whether a psychiatric defense can be realistically employed. From the inception of my representation of this defendant, throughout all of our numerous meetings, throughout our detailed discussion of the facts of the case and throughout pre-trial preparations there was absolutely no indication that a physiatrist [sic] defense could be employed. Simply because this defendant might have had abnormal sexual proclivities, or marital stress, which might have motivated his conduct is not, and was not, grounds for the employment of a psychiatric defense. Such a defense would have been counter productive.

(Naiburg Aff., Pet. Ex. E, ¶¶ 4–6.) Naiburg also stated that the Petitioner's parents were not privy to communications bound by the attorney-client privilege. (Naiburg Aff. ¶ 7.)

The County Court agreed with Naiburg and denied the motion. As for the psychiatric condition, the County Court recognized that Naiburg "could have felt the risk of a dual defense outweighed its benefits, especially in light of his affidavit expressing his doubt as to the viability of a psychiatric defense." (Cnty. Ct. Decision, Dkt. No. 14-25, at 37.) As for the right to testify, the County Court focused on "[t]he lack of corroboration in the trial record, the unsubstantiated affidavits, and the opposing affidavit from trial counsel." (Id. at 39.) To bolster this stance, the County Court expressed skepticism that the Petitioner "hired an attorney who his father claims told them early on that he never allows his client to testify and that even though he knew Michael wanted to testify, he doubted he would put him on the stand." (Id.) All in all, the County Court credited Naiburg's "well-planned strategy" to recognize the Petitioner's "poor character" in

hopes that the jury "would connect with him and see the case as he sees it, that is—his client committed a crime, but not the crime charged by the People." (Id. at 36–37.)

The Petitioner appealed to the Second Department, presenting four bases of error: (1) the evidence was insufficient for a jury to convict him; (2) his trial counsel was ineffective on the following issues: (i) his psychiatric condition, (ii) the Petitioner's sentencing, and (iii) the right to testify; (3) the trial court improperly rejected the Petitioner's request for a renunciation charge; and (4) the Petitioner's sentence was excessive. (Appellant's Br., Dkt. No. 14-26, at 24–67.)

### 2. The Direct Appeal

The Second Department affirmed, holding that: (1) the Petitioner's conviction was "supported by legally sufficient evidence"; (2) the Petitioner received "effective assistance of counsel at trial and at sentencing"; (3) the renunciation charge was properly denied because "the kidnapping of the child-victim was complete when the [Petitioner] forcibly seized the child, placed her in his car, which had tinted windows, and drove off from the place where he had grabbed her"; and (4) the Petitioner's sentence was not excessive. People v. Burkhardt, 81 A.D.3d 970, 971, 917 N.Y.S.2d 884 (2d Dep't 2011). The Petitioner then requested leave to appeal, which was denied by the New York Court of Appeals. People v. Burkhardt, 17 N.Y.3d 793, 952 N.E.2d 1096 (2011).

### 3. The Present Petition

The Petitioner timely submitted this writ of habeas corpus under the provisions of 28 U.S.C. § 2254, raising the same grounds for relief as he did in his direct appeal except for the excessive sentence argument. (Pet. ¶¶ 4–8.)

## II. DISCUSSION

### A. The Legal Standard Under 28 U.S.C. § 2255

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." Williams v. Taylor, 529 U.S. 362, 399, 120 S. Ct. 1495, 1516, 146 L. Ed. 2d 389 (2000) (O'Connor, J., concurring). Under the AEDPA, the petitioner must show "that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

If a state court adjudicated the merits of a claim, a federal court may not grant a writ of habeas corpus unless the state court's decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.SC. § 2254(d). The Supreme Court has construed the AEDPA "to give independent meaning to 'contrary [to]' and 'unreasonable.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000).

A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13, 120 S. Ct. at 1523 (O'Connor, J., concurring). A decision involves "an unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. at 1523 (O'Connor, J., concurring). This standard does not require that all

reasonable jurists agree that the state court was wrong. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

The AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.'" Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 132 S. Ct. 490, 491, 181 L. Ed. 2d 468 (2011) (per curiam)). This standard is "'difficult to meet,'" and for good reason. White v. Woodall, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014) (quoting Metrish v. Lancaster, 133 S. Ct. 1781, 1786, 185 L. Ed. 2d 988 (2013)), reh'g denied, 134 S. Ct. 2835 (2014). Section 2254(d), as amended by the AEDPA, "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Harrington v. Richter, 562 U.S. 86, 102, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011). Thus, a petition must show that the "state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103, 131 S. Ct. at 786–87.

Furthermore, a state court's determinations of factual issues are "presumed to be correct," and the Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). A state court's findings of fact will be upheld "'unless objectively unreasonable in light of the evidence presented in the state court proceeding.'" Lynn, 443 F.3d at 246–47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003)). Thus, a federal court may overrule a state court's judgment only if "after the closest

examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated."  Williams, 529 U.S. at 389, 120 S. Ct. at 1511.

**B. As to the Sufficiency of the Evidence**

First, the Petitioner challenges the sufficiency of the evidence that underlies his kidnapping conviction.  See Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."); see also Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) (recognizing that a federal court can address legal sufficiency claims but not "weight of the evidence" claims).  The Petitioner contends that he restrained the victim but never did so "with intent to prevent [her] liberation," as required to establish the element of abduction and thus the crime of kidnapping.  N.Y. Penal Law § 135.00(2).  Under the Petitioner's view, he is guilty of either attempted kidnapping or unlawful imprisonment.

To evaluate the sufficiency of the evidence, "[a] federal court must look to state law to determine the elements of the crime."  Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999). Under New York law, "[a] person is guilty of kidnapping in the second degree when he abducts another person."  N.Y. Penal Law § 135.20.  To abduct is "to restrain a person with intent to prevent his liberation" by, among other methods, "secreting or holding him in a place where he is not likely to be found."  N.Y. Penal Law § 135.00(2).  One example is placing another person in the backseat of a car.  See, e.g., People v. Carter, 263 A.D.2d 958, 958, 695 N.Y.S.2d 458, 458 (4th Dep't 1999); People v. Salimi, 159 A.D.2d 658, 659, 552 N.Y.S.2d 964, 965 (2d Dep't 1990).

By contrast, "[a] person is guilty of unlawful imprisonment in the second degree when he restrains another person."  N.Y. Penal Law § 135.05 (emphasis added).  Put another way, the difference between kidnapping and unlawful imprisonment charges is the abduction element. See Donnino, Practice Commentary, McKinney's Cons Laws of NY, Penal Law § 135.00 ("[T]o restrain another constitutes the lesser offense of unlawful imprisonment, and to abduct another constitutes the far more serious offense of kidnapping.").  In this case, the Court must evaluate whether the Petitioner took the victim to a place where she was "not likely to be found."  N.Y. Penal Law § 135.00(2).

In making this challenge, the Petitioner "'bears a heavy burden, as the standard of review is exceedingly deferential.'"  United States v. Brock, 789 F.3d 60, 63 (2d Cir. 2015) (quoting United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)).  The Court "'must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility.'" Id.  The Court will uphold the conviction if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Id.

The Petitioner has failed to meet his burden.  Along with the child safety locks, the use of physical restraints could convince a rational trier of fact that the Petitioner prevented the victim from escaping or crying out for help.  Similarly, parking next to a wooded area in a "quiet residential neighborhood" with tinted windows could be construed as an effort to decrease the attention of eyewitnesses.  (Trial Tr. 130, 317–18, 642–43.)

The Petitioner discusses the precise tint of the windows.  (Pet. at 89).  To be sure, no evidence was offered to determine the darkness of the tint.  See N.Y. State Vehicle & Traffic Law § 375, Subd. 12-a(b)(2) (setting the legal amount of tint: "a light transmittance of less than

seventy-percent"). What is relevant here, however, is not the darkness of the tinting but the extent to which the tinting prevented a passerby from noticing the victim in the backseat.

The Petitioner also stresses that he traveled a short distance over a short period of time in a decal-covered car and thus could not have premeditated the crime. (Pet. at 87.) However, he has failed to show that such a conclusion is required as a matter of law. As stated above, the Court must draw all inferences in favor of the Government, and after doing that, the evidence would allow a rational juror to conclude that the Petitioner had a preconceived plan to catch the victim after she separated from her mother.

The cases cited by the Petitioner do not change this conclusion. See, e.g., United States v. Rodriguez, 587 F.3d 573, 580 (2d Cir. 2009) (analyzing the Hostage Taking Act, which is not at issue); People v. Elliassen, 20 Misc.3d 1143(A), 873 N.Y.S.2d 236 (Sup. Ct., Richmond Cnty. 2008) (arising out of a first-degree unlawful imprisonment charge where the defendants drove a handcuffed victim to an isolated area and then left him there); People v. Graham, 14 Misc.3d 18, 19, 829 N.Y.S.2d 411, 412 (2006) (evaluating a second-degree unlawful imprisonment charge because the defendant test-drove a vehicle but ignored the passenger-salesman's instructions to relinquish control); People v. Brinson, 55 A.D.2d 844, 845, 390 N.Y.S.2d 335, 337 (4th Dep't 1976) (finding that no abduction occurred because the defendant commandeered a car with the victim already inside but released him after "learning that [the victim] could not drive the car" and assist with any robberies).

In the Court's view, a rational juror could conclude from the totality of the evidence that the Petitioner kidnapped the victim. Thus, his legal sufficiency claim as to the kidnapping conviction is denied.

**C. As to Ineffective Assistance of Counsel, Generally**

To establish ineffective assistance of counsel, the Petitioner must show that his counsel performed deficiently and that this deficient performance prejudiced the outcome of the trial. Strickland v. Washington, 466 U.S. 668, 688–92, 104 S. Ct. 2052, 2064–67, 80 L. Ed. 2d 674 (1984). In reviewing the totality of the evidence, the Court must "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 134 S. Ct. 10, 13, 187 L. Ed. 2d 348 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, 190, 131 S. Ct. 1388, 1403, 179 L. Ed. 2d 557 (2011)). With this high bar, it is no surprise that "the great majority of habeas petitions that allege constitutionally ineffective counsel" fail. Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001)

As for deficient performance, the Petitioner must establish that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S. Ct. at 2064. This inquiry embraces "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S. Ct. at 2065. In that regard, reviewing courts must be wary of the "distorting effects of hindsight," Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (internal quotation marks omitted), as "[t]here are countless ways to provide effective assistance in any given case and that [e]ven the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (alterations in original) (internal quotation marks omitted).

As for prejudice, the Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability "lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome

in the case.'" <u>Lindstadt</u>, 239 F.3d at 199 (quoting <u>Strickland</u>, 466 U.S. at 693, 104 S. Ct. at 2067–68)).

Here, the Petitioner raises three bases of error: (1) his trial counsel failed to consult with a psychiatrist to inquire about a diminished capacity defense; (2) the lack of psychiatric evidence increased the Petitioner's sentence and his classification under the Sexual Offender Registration Act; and (3) his trial counsel prohibited him from testifying.  (Pet. ¶¶ 5–7.)  However, as discussed below, under the rule in <u>Strickland</u>, the Petitioner has failed to establish a deficiency.

**1. As to the Psychiatric Condition Contention**

The Petitioner's first argument—that Naiburg was ineffective by failing to introduce psychiatric evidence—is without merit.  The Petitioner, armed principally with Dr. Bardey's report, argues that he suffered from "acute stress disorder" at the time of the crime.  This condition, the Petitioner explains, negated his ability to form the necessary intent to kidnap.  <u>See</u> <u>People v. Almonor</u>, 93 N.Y.2d 571, 580, 715 N.E.2d 1054, 1059, 693 N.Y.S.2d 861 (1999) ("A <u>mens</u> <u>rea</u>-type defense . . . serves to negate a specific intent necessary to establish guilt.")

In the Court's view, it was not objectively unreasonable for Naiburg to forgo a psychiatric evaluation because the Petitioner conceded that he "had no prior criminal history or history of mental illness."  (Pet. at 95; <u>see also</u> Gov't Opp'n Br. at 8.)  Taking into account the Petitioner's confession and the events that followed the kidnapping, there were reasonable grounds for Naiburg to make this strategic decision.  Initially, having in mind a lack of psychiatric disorder history, cross-examination of Dr. Bardey's evaluation could have rendered it not only ineffective but contrary to the Petitioner's interests.

The Petitioner essentially argues that the bizarre nature of the crime should have indicated that he suffered from a psychiatric disorder. (Pet. at 95.) However, criminals often exhibit bizarre or otherwise unexplainable behavior not associated with psychiatric disorders.

The Petitioner places great weight on Hinton v. Alabama, 134 S. Ct. 1081, 1089, 188 L. Ed. 2d 1 (2014) (per curiam), which held that "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." However, that case involved a counsel's failure to replace an inadequate expert witness "on a mistaken belief that available funding was capped" and already exhausted under an applicable statute. Id. at 1088. Unlike the Hinton attorney, however, Naiburg did not misinterpret applicable law. He made a strategic decision to avoid a secondary defense that might have further damaged his client.

The Petitioner also relies on several cases for the proposition that Naiburg failed to conduct a reasonable investigation. (Pet. at 99–100 (citing Etoria v. Bennett, 292 F. Supp. 2d 456, 466 (E.D.N.Y. 2003).) However, the circumstances in those cases—many of which are based on rape or sexual abuse charges—are markedly different than the circumstances in this case. See, e.g., Gersten v. Senkowski, 426 F.3d 588, 610 (2d Cir. 2005) (concluding that defense counsel failed to review medical records "that would likely have yielded exculpatory evidence"); Pavel v. Hollins, 261 F.3d 210, 223–24 (2d Cir. 2001) (describing the defense counsel's failure to call an expert witness to interpret physical evidence presented by the prosecution); Foster v. Lockhart, 9 F.3d 722, 726 (8th Cir. 1993) (finding ineffective assistance on rape charges because the accused suffered from impotency and the attorney's investigation of that defense was limited to a single telephone call); Loyd v. Whitley, 977 F.2d 149, 158 (5th Cir. 1992) (determining that trial counsel rendered ineffective assistance by failing to examine the accused's sanity—deemed

a "critical issue" by the state court—because counsel "wrongly assumed that funds were unavailable" for an independent psychological examination). It is reasonable to assume that offering a psychiatric defense—without any prior history of mental illness or psychiatric treatment—may have impaired the impact of other defenses. Accordingly, the Court rejects the Petitioner's psychiatric defense argument.

## 2. As to the Petitioner's Sentence

The Petitioner also argues that the lack of psychiatric evidence resulted in a higher sentence and the potential for a higher risk-level as a sex offender. (Pet. at 107–09.) This argument fails for the same reasons discussed above. Naiburg's performance was not deficient, and with reasonable certainty, psychiatric evidence would not have had a favorable effect on the outcome on the case.

As for the Petitioner's sentence, the trial court judge imposed a determinate term of seventeen years—eight years less than the maximum sentence and three years less than the Government's recommendation. (Sentencing Tr. 5, 7–8, 27–29.) Introducing a psychiatric defense with no prior mental history could have produced a less favorable outcome.

For similar reasons, the Petitioner's risk-level argument is unsound. The New York State Sex Offender Registration Act—New York's version of "Megan's Law"—requires a person to register as a "sex offender" if he is convicted of a "sex offense," which includes second-degree kidnapping "provided the victim of such kidnapping . . . is less than seventeen years old and the offender is not the parent of the victim." N.Y. Corr. Law § 168-a(1)–(2). An offender's risk-level is determined at a separate hearing. People v. Mingo, 12 N.Y.3d 563, 571, 910 N.E.2d 983, 988, 883 N.Y.S.2d 154 (2009) (citing People v. Windham, 10 N.Y.3d 801, 802, 886 N.E.2d 179, 180, 856 N.Y.S.2d 557 (2008)). To determine the appropriate risk-level, the hearing court will

"review any victim's statement and any relevant materials and evidence submitted by the sex offender and the district attorney," among other evidence.  N.Y. Corr. Law § 168-n(3).  In other words, the court is free to consider evidence submitted by the Petitioner that tends to show a non-sexual motive.  Thus, Naiburg's performance was not deficient on this point.

In the Court's considered view, the Petitioner has not demonstrated a reasonable probability that the outcome would be different if Naiburg introduced psychiatric evidence. Accordingly, neither of the Petitioner's sentencing arguments would lead to a granting of the writ at issue.

### 3. As to the Petitioner's Right to Testify

The Petitioner makes a third claim—that Naiburg prevented him from testifying.  In post-trial affidavits, the Petitioner and his parents assert that Naiburg ignored the Petitioner's requests to testify and threatened to withdraw if the Petitioner did not relent.  (M. Burkhardt Aff. ¶¶ 6, 8, 10; Breinlinger Aff. ¶¶ 9; G. Burkhardt Aff. ¶¶ 5, 7, 11, 15, 19.)  Naiburg argues, under penalty of perjury, that the Petitioner "made strong representations that he did not wish to testify at trial." (Naiburg Aff. ¶ 4.)

Section 2255 requires a district court to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ."  28 U.S.C. § 2255(b).  "To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a 'plausible' claim . . . not that 'he will necessarily succeed on the claim.'"  Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (quoting Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000)).  Yet the Petitioner "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief."  Gonzalez v. United States, 722

F.3d 118, 131 (2d Cir. 2013); <u>Puglisi</u>, 586 F.3d at 213 (comparing an evidentiary hearing with a summary proceeding).

The County Court rejected the Petitioner's argument, citing <u>Underwood v. Clark</u>, 939 F.2d 473 (7th Cir. 1991).  (Cnty. Ct. Decision at 39.)  In that case, the Court of Appeals for the Seventh Circuit held that a "barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him."  <u>Underwood</u>, 939 F.2d at 476.  Otherwise, a defendant need only say, "My lawyer wouldn't let me testify.  Therefore I'm entitled to a new trial."  <u>Id.</u> (internal quotation marks omitted).  Under that appropriate logic, the Petitioner's request for a hearing— based on his affidavit and that of his parents—would be denied.

However, the Second Circuit took a more restrictive view in <u>United States v. Chang</u>, 250 F.3d 79 (2d Cir. 2001) ("<u>Chang II</u>").  To the extent that <u>Underwood</u> permitted summary dismissal, the Second Circuit disagreed, finding that dismissal without a hearing was "inappropriate" in cases "involv[ing] off-the-record interactions with . . . trial counsel."  <u>Id.</u> at 85.

Nevertheless, Section 2255 does not require "a full-blown testimonial hearing" when the district court can solicit written submissions sufficient to adequately supplement the record.  <u>See id.</u>  In <u>Chang II</u>, for example, the Second Circuit relied on "a detailed affidavit from trial counsel" instead of an evidentiary hearing.  <u>Id.</u> at 85.  Chang, like the Petitioner, requested an evidentiary hearing on his ineffective assistance of counsel claim, alleging that his trial counsel prohibited him from testifying.  <u>Id.</u> at 81.  At the district court's request, trial counsel supplemented the record with a detailed affidavit stating that Chang "decided that he did not wish to testify in his own defense . . . believ[ing] his prospects were best served by requiring the

government to satisfy its burden . . . ." Chang v. United States, No. 98–CV–7354 ILG, 1999 WL 439097, at *2 (E.D.N.Y. May 3, 1999) ("Chang I") (alteration in original) (internal quotation marks and citations omitted); see also Chang II, 250 F.3d at 81 (presenting a four-paragraph excerpt of trial counsel's response). The district court sided with trial counsel, as "the only evidence offered by Chang in support of his claim is his own statement that [trial counsel] forbade him from taking the stand." Chang I, 1999 WL 439097 at *2. Cf. Quinones v. United States, 637 F. App'x 42, 43 (2d Cir. 2016) (unpublished) (concluding that the district court erred when it dismissed the prisoner's affidavit in favor of the trial attorney's unsworn statement that was not evidence).

On appeal, the Second Circuit affirmed. Chang II, 250 F.3d at 86. Although an evidentiary hearing would have provided "demeanor evidence or the cross-examination of counsel," it was within the district court's discretion to decide that live testimony would have added "little or nothing to the written submissions." Id. The district court judge had tried the case and was "intimately familiar" with the procedural history. Id. More importantly, "[t]rial counsel's detailed description of events" rebutted Chang's "highly self-serving and improbable assertions." Id.

This case yields a similar conclusion. Naiburg states, in his sworn affidavit, that the Petitioner did not want to testify and that the Petitioner's parents were not privy to all conversations between the attorney and his client. (Naiburg ¶ 7.) The Petitioner, relying on "highly self-serving and improbable assertions," has not presented a plausible reason to dispute this account. See Chang II, 250 F.3d at 86. Nor has he pointed to any portion of the record that undermines Naiburg's affidavit. Therefore, a full-fledged evidentiary hearing is unnecessary.

True enough, this case does diverge from <u>Chang</u> in at least three aspects: (1) this Court did not try the underlying case; (2) this Court has not solicited any written submissions; and (3) the Petitioner submitted three affidavits, not one. However, in the Court's view, those differences are unpersuasive. First, the Second Circuit grounded its analysis in "[t]rial counsel's detailed description of events," not the district court's familiarity with the prior proceedings. <u>Id.</u> Second, the Court does not need to supplement the record because Naiburg already submitted a detailed affidavit on this subject in response to the Petitioner's motion.

The third difference requires more consideration. On the surface, the parents' affidavits repeat the allegations made in the Petitioner's affidavit. Upon closer inspection, they cast doubt on the Petitioner's claim. For instance, the Petitioner includes letters between his mother and Naiburg, in which she indicated an awareness of legal rights and trial details. (<u>See</u> Breinlinger Ltr. to Naiburg at 30 (Miranda rights) & 32 (<u>Wade</u>, <u>Mapp</u>, and <u>Huntley</u> hearings).) His father also stated that he knew of Naiburg's purported position that he never lets clients testify. (G. Burkhardt Aff. ¶ 5.) As a result, the Court shares the County Court's skepticism that the Petitioner "hired an attorney who his father claims told them early on that he never allows his client to testify and that even though he knew Michael wanted to testify, he doubted he would put him on the stand." (Cnty. Ct. Decision at 39.) Thus, in the Court's discretion, no evidentiary hearing is required in this situation.

As a final matter, Naiburg's opening statement, in which he indicated that the Petitioner might testify, does not constitute a <u>Strickland</u> violation. <u>People v. Benevento</u>, 91 N.Y.2d 708, 714–15, 697 N.E.2d 584, 589, 674 N.Y.S.2d 629 (1998) ("[C]ounsel's ultimate decision not to call defendant to the stand—albeit following representations to the contrary made in opening remarks—does not constitute an objectively incompetent performance.").

Furthermore, even if the Petitioner's right to testify was violated, the Court finds no reasonable probability that the outcome would have been different. The Government's case was extremely strong, especially in light of the victim's articulate testimony.

In sum, the Petitioner's ineffective assistance of counsel claims are denied in their totality.

## D. The Missing Renunciation Jury Charge

Finally, the Petitioner argues that the trial court erred by denying his request for a renunciation charge. Under New York law, renunciation is "an affirmative defense that, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, the defendant withdrew from participation in such offense prior to the commission thereof and made a substantial effort to prevent the commission thereof." N.Y. Penal Law § 40.10(1). To receive this jury instruction, the Petitioner would have had the burden of establishing his renunciation of the crime by a preponderance of the evidence. N.Y. Penal Law § 25.00(2).

This Court recalls that the trial court concluded that "Unlawful Imprisonment in the Second Degree would have been [] completed as of the time the infant was placed in the back of the car and the car was positioned in a secluded area." (Trial Tr. 690–691.) Although this decision was ostensibly based on the lesser included offense, the Government finds no prejudice, in part, because "the greater offense [of second-degree kidnapping] had also been completed." (Gov't Opp'n Br. at 13.)

In determining whether the Petitioner suffered prejudice, the Court must ask "whether 'the [missing] instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Grey v. Henderson, 788 F. Supp. 683, 693 (E.D.N.Y. 1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S. Ct. 396, 400, 38 L. Ed. 2d 368 (1973)). To aid this analysis

as to renunciation, the Second Circuit requires an affirmative response to three questions:

(i) whether the renunciation jury instruction at issue was required under New York law;

(ii) whether the failure to provide that charge made the conviction unfair; and (iii) whether that

failure is remediable by habeas corpus.  See Davis v. Strack, 270 F.3d 111, 124 (2d Cir. 2001).

The Petitioner's burden is "especially heavy" because "[a]n omission . . . is less likely to be

prejudicial than a misstatement of law."  Sullivan v. Blackburn, 804 F.2d 885, 887 (5th Cir.

1986).

Even if the trial court should have included a renunciation charge under question (i),

question (ii) is dispositive.  That failure did not "infect[] the entire trial [so] that the resulting

conviction violates due process."  Grey, 788 F. Supp at 693 (internal quotation marks omitted).

Further, for a renunciation to be effective, it must be voluntary—in other words, "a change of

heart that is not influenced by outside circumstances."  People v. Taylor, 80 N.Y.2d 1, 13, 598

N.E.2d 693, 699, 586 N.Y.S.2d 545 (1992); see also People v. Jenks, 239 A.D.2d 673, 675, 657

N.Y.S.2d 229, 231 (3d Dep't 1997) (concluding that "the victim's artful persuasion . . .

prevented the commission of the crime").  In this case, the Court finds that there was artful

persuasion by the victim who kicked, screamed, and pleaded with her captor to let her go.  (Trial

Tr. 315, 318, 327, 352.)

The Petitioner's reliance on Dingle v. Mance, 716 F. Supp. 2d 309, 322 (S.D.N.Y. 2010),

in which the Southern District of New York granted habeas relief for a missing justification

charge, does not compel a different result for two reasons.  First, justification is a defense—not

an affirmative defense—which requires the Government to disprove the defense beyond a

reasonable doubt.  Id. at 313.  Second, in Dingle, key facts were undisputed—namely, that the

defendant "was at some point justified in defending himself against [an] armed attack" but the

timeline of events was unclear.  <u>Id.</u> at 322.  "Viewing the evidence in the light most favorable to

[the defendant] and drawing all reasonable permissible inferences in his favor," the Southern

District determined that the jury should have received a justification instruction.  <u>Id.</u> at 322–23.

This case is different.  Here, the Government proved that the crime of second-degree kidnapping

was complete when the Petitioner put the victim in the backseat of his car and shut the door.

(Trial Tr. 629.)  In sum, given the strength of the evidence supporting the Government's case,

any error concerning a renunciation charge did not affect the outcome of the trial, nor did it

infringe upon the Petitioner's substantive rights.

### III. CONCLUSION

The Court finds that this petition for a writ of habeas corpus is denied in its entirety.  The

petition is dismissed, and the Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
December 1, 2016

*/s/ Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge
